**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

THOMAS J. STILES                :
                                :
            Petitioner,         :        Civil No. 09-5331 (NLH)
                                :
        v.                      :
                                :            **O P I N I O N**
ROBERT BALICKI, et al.,         :
                                :
            Respondents.        :

---

**APPEARANCES:**

Thomas J. Stiles, <u>Pro</u> <u>Se</u>
#508371/564387B
Cumberland County Jail
54 W. Broad Street
Bridgeton, NJ 08302

Shanna McCann, Esq.
Chance & McCann
P.O. Box 10
Woodstown, NJ 08098
Attorney for Respondents

Matthew M. Bingham, Esq.
Cumberland County Prosecutor's Office
43 Fayette Street
Bridgeton, NJ 08302
Attorney for Respondents

**HILLMAN, District Judge**

     This matter is before the Court on Petitioner's petition for

a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254.  For

the following reasons, the petition will be denied.

## BACKGROUND

### A.    Factual Background

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division ("Appellate Division"), in Petitioner's direct appeal.[1]

> When the crimes occurred, in March 2003, defendant was thirty-five years old. Members of the Cumberland County Prosecutor's Office Internet Crimes Against Children Task Force conducted what is commonly referred to as a sting operation. The Task Force registered and paid for an internet account with America Online (AOL). Investigator Keith Dunn, a Task Force member, using invented screen names and corresponding profiles, entered AOL chat rooms. The created names and profiles were of fictitious young boys or girls.

> Using the invented screen name, Dunn would enter particular member-created special interest chat rooms. Upon entry into a chat room, it is possible to participate in the chat room's general conversation or engage in private instant messaging (IM) conversations with specific individuals in the room. Dunn complied with the Task Force policy which did not permit an investigator to initiate a private conversation with a potential suspect. Once instant messages would begin to arrive, however, Dunn would exit the general chat room and engage in one-on-one conversations initiated by another.

> At 3:36 p.m. on March 18, 2003, Dunn used the screen name "LizD1990" to enter the AOL chat room "Iluvmucholdermen." Dunn had created a profile for LizD1990. Under "name," he entered "Elizabeth, Liz, Lizzy, Cutie." He completed the profile with other

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

playful entries; for example, Liz's "personal quote"
was "boys ma age r such DORKS!!!!"

     As soon as Dunn entered the chat room, he typed
two entries: "Hiyee" and "12 F NJ only guys from near
NJ IM me please." These comments sparked a few joke
responses, such as, "LOL, jail bait"; "all New Jersey
pedophiles line up"; and "[h]ave some Ovaltine, Liz."

     Dunn also received an instant message from
"Stigol67" at 3:38 p.m. that he did not consider a
joke. This AOL user turned out to be defendant. His
profile listed his name as "For you to gain my trust
and ask." Under hobbies and interests, he listed
"[m]ost all, but the best is to [be] found in bed."
Stigol wrote that his "favorite gadgets" were "[y]oung
and tight ... well let you figure that out."

     An hour-long conversation ensued, featuring
increasingly sexual dialog initiated by defendant. He
continually asked Liz whether she was "really 12." He
inquired whether Liz was a virgin to all things or if
she had ever performed oral sex. He asked for her
description, and expressed his delight that she was
five feet tall and almost ninety pounds.

     Defendant pressed for a private meeting,
suggesting an isolated location near where she lived,
recognizing that at her age she could not drive. She
expressed interest in such a meeting but explained the
difficulty of getting away from the supervision of her
mother. Defendant told Liz to be careful and inquired
whether anyone could see her computer screen.

     Liz and defendant exchanged pictures during the
conversation. Dunn forwarded the childhood picture of a
fellow investigator. That photograph is reproduced in
the record, and it plainly depicts a child not more
than twelve years old.

     The two agreed to meet at an abandoned parking
lot, although there was a long conversation about Liz's
ability to sneak out of dance class and return before
her mother got home. The arrangements were made, but
because of car trouble, Dunn was unable to intercept
defendant at the designated meeting place. The next
morning, Dunn received an e-mail from defendant that
had been sent the previous evening, which said, "Hey I

waited till 5:30 for you but didn't see you ... saw a
car that kept going around, so I booked. E-mail me or
IM me..I'll be on till midnight." Liz responded at 8:59
a.m. She stated that she could not meet Stigol because
her mother came home as she got out of the shower and
drove her to the dance studio. There was no further
contact on March 19, 2003. However, defendant sent a
lengthy e-mail at 4:26 a.m. on March 20. It read:

Lizzie,

Hmmm, ok ... but I'm still being very careful till you
meet and play with me. Still have to be careful till I
know you are for real. I was there, no lie ... just got
spooked because of another car driving around ...
thought maybe you could have been a cop or called the
cops on me. I think we should try on Saturday to meet.
In the morning, this way we can meet, talk, kiss and
play without rushing. I would like to pick another
place easier to[ ]go for you to have you wait and I
would pick you up and bring you back to my place where
we could sit on the couch and show me what you know.
Start with a little kissing, feeling and then stripping
each other. You want to feel my cock in your hands?
Maybe suck on me like the big girls do? I can teach you
if you are eager. Do you have tits yet? Small would be
nice and flat chested is cool too. I can get off
sucking on just your little nipples, but I really want
to bury my face in [ ]between your legs and see if you
have red hair down around your pussy too and taste you
after you get wet for me. Write to me or IM me later
and tell me what you want me to do to you once we get
back to my house ... tell me anything. Question, when
was that pic taken? I love your face, nice smile,
pretty eyes and love your red hair ... are you going to
smile like that when I lick your pussy?

If any of this is too much, that is cool too ... just
let me know and we can go at your speed ... ok got to
go, caught [sic] you later. TJ

    The parties continued to exchange instant
messages. Defendant continued to graphically describe
the sexual acts he intended to perform with Liz. Her
responses made clear that she was young and sexually
inexperienced. Although she continued to express
interest in sexual activity, she also continued to
express apprehension about whether it would hurt,

4

whether she might get pregnant, whether she might get caught, and the like.

A meeting was arranged at a local car wash at a specified time. In their conversations, defendant suggested that when they met they could drive to his house, where they could be alone and perform the sexual acts.

Dunn and other law enforcement personnel surveilled the car wash. At the designated time, defendant arrived driving a vehicle described in the conversation and proceeded immediately to the specific meeting place that had been discussed. Dunn and another officer arrested defendant for setting up a meeting for the purpose of having sex with a twelve-year-old girl. Defendant was advised of his <u>Miranda</u> rights. He acknowledged them and initialed a <u>Miranda</u> form. He acknowledged to Dunn that his reason for being there was "because the girl was really cute." Defendant consented to the search of his home and computer hard drive.

Dunn and other officers went to defendant's home. Defendant told the officers he lived there alone, that no one else used his home computer, and no one else could access his screen name. When the officers arrived at defendant's home, the computer was open and the picture sent by Dunn of the young girl that was purportedly Liz was on the screen.

At the stationhouse, defendant gave a lengthy tape-recorded statement. He acknowledged his ongoing communications with Liz, that he went to the designated parking lot to meet her when she did not arrive, and that he continued pursuing her with the intention of engaging in sexual activity. He gave no indication that he believed he was role-playing with an individual who was actually an adult but was merely pretending to be twelve years old. The taped statement was submitted to the jury at trial.

Defendant testified in his own behalf. He acknowledged that he had frequented the "Iluvmucholdermen" chat room for about one-and-one-half years prior to his arrest. He said he pursued sexual relationships with several women with whom he first spoke online. On this occasion, he did not view Liz's

profile until after he initiated the conversation.
Nevertheless, he disregarded the profile information
because, based on his experience, he knew that no young
girl could have an AOL profile or enter a mature chat
room. He based his knowledge of AOL's parental controls
on his efforts to create a limited screen name for his
young son.

Defendant contended that he made the increasingly
sexual comments to Liz because he believed he was
role-playing with an adult, in spite of the many
references to Liz's young age and her mother and
grandmother. He said he made the sexual comments
because he wanted to discern the sexual experience and
proclivities of the woman with whom he was
communicating and to indulge her fantasies. He insisted
that he believed he was dealing with an adult. He
pointed to several aspects of the conversations which
to him suggested she was an adult. As to Liz's petite
size, defendant described a former adult girlfriend of
his who was about the same size. He contended that he
believed Liz's "dance class" referred to an adult dance
hall or a private gentlemen's club.

Dunn acknowledged under cross-examination that AOL
rules require an individual to be at least eighteen to
create a profile. He agreed that, when setting up a new
screen name, AOL asks the user, "Are you creating this
screen name for a child?" AOL then provides a parent
disclaimer form encouraging parents to utilize
particular parental controls in order to protect the
safety and privacy of their children. These parental
settings permit the parent to choose the appropriate
age category for the child. When a parent selects the
"under twelve" age category, the child cannot use AOL's
IM service and can only enter monitored chat rooms. The
child could not access the "Iluvmucholdermen" chat
room.

Dunn agreed with defense counsel that he logged
into AOL as someone with no parental controls. However,
Dunn refused to believe that this supported defendant's
claim that no young child could be present in the chat
room. Dunn did not know the date AOL placed the
parental control information on its server. Dunn
believed an underaged individual could create a screen
name and enter a mature chat room if he or she was
determined to do so. For example, a knowledgeable

thirteen-year-old could get a password cracker to ascertain the master screen name password, and then follow the basic procedure to create his or her own screen name.

The jury obviously rejected defendant's contention that he was role-playing and convicted him of the offenses we have described.

State v. Stiles, 2007 WL 3170148 (N.J. App. Div. Oct. 31, 2007) (Respondents' Appendix "RA" 6)(internal footnote omitted).

## B.   **Procedural Background**

Petitioner was charged in Indictment 03-06-526, Cumberland County, with attempted aggravated sexual assault, attempted endangering the welfare of a child, luring, unlawful possession of an assault weapon, and unlawful possession of a large capacity ammunition magazine, in violation of New Jersey state law.   On May 21, 2004, a jury found Petitioner guilty of counts one through three, and not guilty of the weapons charges.   On November 19, 2004, Petitioner was sentenced to an aggregate eight year term of imprisonment, subject to New Jersey's No Early Release Act (NERA).   On October 31, 2007, Petitioner's convictions were affirmed, but the sentences were remanded.   On March 27, 2008, the New Jersey Supreme Court denied certification to review Petitioner's appeal (RA 9).   The United States Supreme Court denied a writ of certiorari on December 15, 2008 (RA 10).

On May 4, 2009, Petitioner filed a pro se petition for post-conviction relief (PCR) (RA 11).   On July 27, 2009, the PCR

motion was dismissed (RA 14).  On September 23, 2010, the PCR
motion was reinstated (RA 15).

Meanwhile, in this District Court, on October 9, 2009, the
Clerk of the Court received from Petitioner a letter titled:
"Confusion with requirements towards timely filing of a Petition
for a Writ of Habeas Corpus under USC § 2254 by a person in state
custody" (docket entry 1).  In the letter, Petitioner expressed
concern over the timeliness of his filing of a habeas petition.
In response to the letter, this Court issued an Order (docket
entry 2), directing the Clerk of the Court to send Petitioner a
blank § 2254 petition, closing the case, and informing Petitioner
that in order to have the case reopened, he must submit a motion
to reopen, a completed form petition, and either the filing fee
or an application to proceed in forma pauperis ("IFP").  The
Order, sent to Petitioner's address on file, was returned as
undeliverable.

On May 10, 2010, Petitioner submitted a letter asking the
status of his case, and submitting an address change (docket
entry 4).  On June 25, 2010, the case was reopened (docket entry
5).  At that time, parties were added, including Karen Balicki,
the warden of the South Woods State Prison (docket entries 6, 9).

Petitioner submitted the form petition, along with
approximately 100 additional pages, and his application to
proceed IFP on July 21, 2010 (docket entry 6).  At the time he

filed his renewed petition, Petitioner was on parole.  Petitioner argues in the petition that: (1) he has been denied access to the Courts with regard to his post-conviction relief ("PCR") motion in state court; (2) his conviction was the result of entrapment by State personnel; (3) there was no probable cause to prosecute him; (4) the prosecutors conducted an illegal search of Petitioner's computer; (5) the detectives' activities in arresting him, by using an undercover agent, were illegal; (6) the State had no statute supporting an actual violation; (7) the trial judge's instruction to the jury were flawed; (8) the Appellate Division wrongly upheld his conviction; and (9) and (10) [same as 8, concerning Appellate Division errors]. (Petition, ¶ 12).

On November 12, 2010, the Cumberland County Prosecutor's Office, through Assistant Prosecutor Matthew M. Bingham, filed an answer to the petition (docket entry 17).  In the answer, Respondents note:

> On May 4, 2009, the petitioner filed two post conviction relief applications in the Superior Court of New Jersey, Cumberland County.  The first PCR related to Indictments 00-08-770 and 03-06-526; the second was in reference to an unrelated matter under Indictment 03-09-839, which was currently pending review by the Superior Court of New Jersey, Appellate Division.  The State moved to dismiss the PCR in relation to Indictment 03-09-839 pursuant to New Jersey Court Rule 3:22-12 as an appeal was pending.  This Motion was not opposed by the petitioner.  The Court dismissed the PCR as to indictment 03-09-839 on July 27, 2009.  It appears that both petitions were inadvertently removed from active status when this Order was filed.  At some

9

>    point in 2010 the error was discovered and the PCR
>    application under Indictments 00-08-770 and 03-06-526
>    has been reinstated and is currently pending a Status
>    Conference on December 17, 2010.  A second PCR has not
>    been filed- the first PCR was reinstated.

(Answer, ¶ 11).  As such, as an affirmative defense, Respondents

argue that the petitioner has not properly exhausted state

remedies (Answer, p. 13).  Respondents also briefly deny the

allegations of Petitioner's grounds for relief on the merits.

Since the filing of the answer, both Petitioner and

Respondents have kept this Court apprised of the PCR proceedings

in state court.  As of the last letter submitted by Respondents,

on August 8, 2011, the PCR petition was still pending in state

court.

## DISCUSSION

**A.   Exhaustion**

As amended by the Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent

part:

>    (a) The Supreme Court, a Justice thereof, a circuit
>    judge, or a district court shall entertain an
>    application for a writ of habeas corpus in behalf of a
>    person in custody pursuant to the judgment of a State
>    court only on the ground that he is in custody in
>    violation of the Constitution or laws or treaties of
>    the United States.

A state prisoner applying for a writ of habeas corpus in

federal court must first "exhaust[ ] the remedies available in

the courts of the State," unless "there is an absence of

10

available State corrective process[ ] or ... circumstances exist that render such process ineffective ...." 28 U.S.C. § 2254(b)(1).  See also Rose v. Lundy, 455 U.S. 509, 515 (1982); Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997), cert. denied, 532 U.S. 919 (2001) (finding that "Supreme Court precedent and the AEDPA mandate that prior to determining the merits of [a] petition, [a court] must consider whether [petitioner] is required to present [his or her] unexhausted claims to the [state's] courts").

The exhaustion requirement is intended to allow state courts the first opportunity to pass upon federal constitutional claims, in furtherance of the policies of comity and federalism.  See Granberry v. Greer, 481 U.S. 129 (1987); Rose, 455 U.S. at 516-18.  Exhaustion also has the practical effect of permitting development of a complete factual record in state court, to aid the federal courts in their review.  See Rose, 455 U.S. at 519.

A petitioner exhausts state remedies by presenting his federal constitutional claims to each level of the state courts empowered to hear those claims, either on direct appeal or in collateral post-conviction proceedings.  See, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 847 (1999) ("requiring state prisoners [in order to fully exhaust their claims] to file petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State"); Lambert v. Blackwell,

134 F.3d 506, 513 (3d Cir. 1997) (collateral attack in state court is not required if the petitioner's claim has been considered on direct appeal); 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."). Once a petitioner's federal claims have been fairly presented to the state's highest court, the exhaustion requirement is satisfied. See Castille v. Peoples, 489 U.S. 346, 350 (1989); Picard v. Connor, 404 U.S. 270, 275 (1971).

In this case, Respondents argue that the petition is not exhausted because Petitioner's PCR motion is pending in state court. However, an examination of the grounds raised in the petition show that the majority of the claims raised in the petition were raised on direct appeal. Furthermore, this Court notes that it may deny the claims that were not exhausted if they are clearly meritless. Although a petition for writ of habeas corpus may not be *granted* if Petitioner has failed to exhaust his remedies in state court, a petition may be *denied* on the merits notwithstanding Petitioner's failure to exhaust his state court remedies. See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d

355, 357 (3d Cir. 2003).  For the reasons that follow, the petition will be denied on the merits.

**B.**   **Standard of Review**

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent."

13

Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II).  A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter).  Id. at 407-09.  To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409.  In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts.  See Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal case law, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v.

Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19
(2002)).

Finally, a pro se pleading is held to less stringent
standards than more formal pleadings drafted by lawyers.  See
Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404
U.S. 519, 520 (1972).  A pro se habeas petition and any
supporting submissions must be construed liberally and with a
measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d
Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d
Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir.
1969), cert. denied, 399 U.S. 912 (1970).

## C.    **Petitioner's PCR Claims (Ground 1).**

Petitioner argues in the first ground of his petition (Pet.,
¶ 12 at docket entry 6, p. 19), that Petitioner timely filed a
PCR motion which was wrongly dismissed, denying him access to
courts.

The record establishes that since the filing of this habeas
petition, Petitioner's PCR motion has been reinstated in state
court, and remains pending.  As such, Petitioner's claim in
Ground 1 is moot.

## D.    **Petitioner's Entrapment Claim (Ground 2).**

Petitioner argues in Ground Two of his petition (Pet., ¶ 12
at docket entry 6, p. 20), that Detective Dunn "used and
exploited Internet Service Provider (ISP) America Online (AOL) to

15

use unfairly for his own advantage in order to gain a conviction;
that Dunn knowingly and purposefully circumnavigated AOL's
security by signing on as an adult member to use an age-
restricted 'adult' or 'mature' chat room which contained elements
of role-playing . . . ."

The Appellate Division examined this claim on direct appeal
and found:

> Defendant claims that Dunn did not have authority
> to enter a private AOL chat room with the avowed
> purpose to trap individuals wrongly alleged to be
> sexual predators. He argues that Dunn manufactured this
> sting to entice innocent chat room users to commit
> criminal acts. We reject this argument.
>
> We dealt with a factually similar Internet sex
> sting in Davis, supra, 390 N.J. Super. at 580. In that
> case, an undercover investigation yielded an arrest of
> an individual claiming "he had committed no crime as he
> was fantasy role-playing with women he thought to be
> over the age of sixteen." Ibid. We rejected the
> entrapment argument because the defendant initiated
> almost all contact with the alleged child and escalated
> the sexual tenor of the conversations. We added that
> "[n]othing prohibits the police from creating
> characters to conduct undercover investigations.
> Rather, 'decoys, traps, and deceptions properly may be
> used to apprehend those engaged in crime or to obtain
> evidence of the commission of crime.'" Id. at 593
> (quoting State v. Rockholt, 96 N.J. 570, 575 (1984)).
>
> As in Davis, and contrary to defendant's
> assertions, Dunn did not goad defendant into criminal
> conduct. Dunn did not initiate the private IM chat with
> defendant. Rather, defendant began the conversation
> with his question about Liz's true age. When Liz
> responded that she was twelve, defendant quickly began
> to discuss sexual matters and to attempt to arrange a
> meeting. The facts do not support a finding of
> entrapment.

(RA 6; <u>Stiles</u>, <u>supra</u>, at p. *8).

Although Petitioner asserts his claim is for a violation of due process, this Court, in reviewing the record, finds no such violation.  Under New Jersey law, Dunn's actions in entering the chat room were legal and considered solid police work. Respondents note in their answer that Petitioner's allegations do not support an entrapment defense under New Jersey state law (Answer, ¶ 12).

In examining federal law, this Court looks to dicta taken from <u>United States v. Russell</u>, 411 U.S. 423 (1973).  The Court of Appeals for the Third Circuit, in discussing <u>Russell</u>, noted that the Supreme Court "determined that the entrapment defense was not available to the defendant because he was predisposed to committing the crime, but went on to state that some day there may be a due process defense based upon outrageous government conduct." <u>United States v. Pitt</u>, 193 F.3d 751, 759-760 (3d Cir. 1999) (citing <u>United States v. Russell</u>, 411 U.S. at 431).  "In order for the claim of outrageous government conduct to succeed, a government agent has to initiate the criminal conduct with the goal of obtaining a conviction and must draw the defendant into the illegal activity to bring about that goal." <u>Pitt</u>, 193 F.3d at 761 (citing other decisions holding same).

The Third Circuit has held that "a criminal defendant may raise a due process challenge to an indictment against her based

17

on a claim that the government employed outrageous law enforcement investigative techniques." United States v. Nolan-Cooper, 155 F.3d 221, 229 (3d Cir. 1998).  Further explaining, the Court of Appeals found:

> Although the requirement of outrageousness has been stated in several different ways by various courts, the thrust of each of these formulations is that the challenged conduct must be shocking, outrageous, and clearly intolerable....  The cases make it clear that this is an extraordinary defense reserved for only the most egregious circumstances.  It is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating.

Id. at 230-31.  The Third Circuit has held that the conduct of the law enforcement officials must not stop short of conduct violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment.  United States v. Voigt, 89 F.3d 1050, 1065 (3d Cir. 1996) (citing Russell, 411 U.S. at 431-32).

In this case, the "outrageous criminal conduct" defense clearly does not apply to Petitioner's case.  Petitioner's own actions in initiating and discussing sexual matters with a person who claimed to be twelve years old was the crux of the criminal case against Petitioner.  Dunn's detective work was not so "outrageous" as to "shock the universal sense of justice" or to violate the fundamental fairness guaranteed by the Due Process Clause.

18

Furthermore, Petitioner has not demonstrated that the state court rulings were an unreasonable application of "clearly established federal law."  28 U.S.C. § 2254(d)(1); see also Ford v. Varano, 2010 WL 276756 at *9 (E.D. Pa. Jan. 19, 2010)(finding that as the outrageous police conduct doctrine had not been clearly recognized by the Supreme Court, but was rather discussed in dicta, Petitioner's habeas argument had not pointed to any Supreme Court case acknowledging the defense).

Therefore, Petitioner's request for habeas relief on this claim is denied.

**E.    Petitioner's Probable Cause Claim (Ground 3).**

Petitioner argues in Ground 3 (Pet., ¶ 12 at docket entry 6, p. 22) that there was no probable cause to prosecute him, because Dunn testified that probable cause was based on the name of the chat room.  Petitioner raised this claim on direct appeal, and the claim was rejected without discussion (RA 6; Stiles, supra, at *1-2).

Respondents argue, and the record supports, that Dunn did not testify that the probable cause was based on the name of the chat room, as alleged by Petitioner.  Instead, Respondents point out that probable cause to arrest Petitioner arose from not only the nature of the chat room, but the content of Petitioner's emails with Dunn, and Petitioner's arrival at the meeting place with "Liz."  (Answer, ¶ 12).

19

Petitioner has not established a constitutional violation with regard to this habeas claim, and his claim will be denied.

**F.   Petitioner Illegal Search Claim (Ground 4).**

In Ground 4 of his petition (Pet., ¶ 12 at docket entry 6, p. 24), Petitioner argues that Dunn and the prosecutor needed a warrant or consent from AOL to search the "property," as AOL is a privately owned business.  On direct appeal, Petitioner argued that "Detective Dunn did not have jurisdiction to enter AOL to conduct an investigation, [and therefore Petitioner] was denied due process of the law."  (RA 6; Stiles, supra, at *1).  This argument was rejected without discussion.

Respondents argue that, because the chat room was open to the public, and the State did not establish the website, Dunn's action did not require a warrant.  Dunn "merely entered the chat room as any other AOL user would have been able to enter.  The State did not initiate the communication with the petitioner. Instead, the petitioner contacted Detective Dunn."  (Answer, ¶ 12).

This Court agrees that Petitioner has not established a reasonable expectation of privacy in his chat room conversations, in order to establish a Fourth Amendment violation for an illegal search.  See United States v. Valdivieso Rodriguez, 532 F. Supp.2d 332 (D.P.R. 2007)("an expectation of privacy has generally not been found to exist with regard to subscriber

information provided by service users to their internet service providers, records on individuals' internet usage or as to communications made on an internet website.  Nor, with limited exception, have courts generally found a reasonable expectation of privacy to exist in e-mail or electronic chat-room communications")(citations omitted); see also United States v. Maxwell, 45 M.J. 406, 417 (U.S. Armed Forces 1996)(noting that "the more open the method of transmission, such as the 'chat room,' the less privacy one can reasonably expect").

Here, Petitioner has not demonstrated an unreasonable application of clearly established federal law, or an unreasonable application of facts, as required by 28 U.S.C. § 2254(d), and this claim for habeas relief will be denied.

**G.   Petitioner's Claims Regarding Investigation and Statute (Grounds 5, 6).**

Petitioner argues in Ground 5 of his petition (Pet., ¶ 12 at docket entry 6, p. 29) that Dunn's "rewriting provision" of the New Jersey law, and "includ[ing] usage of an undercover agent passing as a fictitious child or victim were illegal."  In Ground 6 of his petition (Pet., ¶ 12 at docket entry 6, p. 30), Petitioner argues that the State "had no support from any state statute presented within complaint/indictment that an actual violation had occurred."

Respondents construe these claims as "alleging that the statute was not meant to apply unless an actual child was involved." (Answer, ¶ 12).

Petitioner essentially raised these claims on direct appeal. The Appellate Division disagreed that Petitioner's conduct could not violate any law, finding:

> Under this statutory scheme [the New Jersey definition of "attempt"], it is clear that the absence of an actual child victim does not exonerate defendant. See, e.g., State v. Condon, 391 N.J. Super. 609, 611, 617-18 (App. Div.) (concluding that "substantial step" attempt liability can be charged even in the absence of an actual child victim), certif. denied, 192 N.J. 74 (2007). Here, the relevant inquiry is whether the allegedly wrongful conduct would constitute a substantial step toward the commission of sexual assault and child endangerment "under the circumstances as a reasonable person would believe them to be," not as the circumstances actually were because of deception. The jury determined that the circumstances would suggest to a reasonable person that the online personality was a twelve-year-old girl. That determination is well supported by the record.
>
> It is equally clear that defendant's conduct constituted a substantial step toward the commission of aggravated sexual assault and endangering the welfare of a child. "[T]he substantial step requirement in the attempt statute is satisfied if a defendant acts in a way that is strongly corroborative of the firmness of his purpose to carry out the crime." State v. Farrad, 164 N.J. 247, 258 (2000) (citations and internal quotation marks omitted). Defendant not only made many graphic and explicit sexual comments in the e-mails and online conversations, but also arranged a meeting and arrived at the scene. This conduct constituted a substantial step toward the commission of the charged crimes. See State v. Davis, 390 N.J. Super. 573, 589-90 (App. Div. 2007). Accordingly, the statute covered defendant's conduct and supports his conviction. See also Condon, supra, 391 N.J. Super. at 611, 617-18.

(RA 6; <u>Stiles</u>, <u>supra</u>, at *8).

It is clear from the record that Petitioner's conviction for attempted aggravated assault and attempted endangering the welfare of a child were justified under New Jersey state law. His conviction was upheld by all levels of the courts in New Jersey and the United States Supreme Court denied his writ of certiorari.  It is apparent that there was significant evidence upon which to convict Petitioner.  While he may not agree with the jury's decision to reject his defense, such disagreement does not render his conviction constitutionally inadequate.  This Court finds no reason to upset Petitioner's convictions. Furthermore, the petitioner has not shown an unreasonable application of clearly established federal law with respect to his sentence, or an unreasonable application of facts, as required by 28 U.S.C. § 2254(d), and these claims for habeas relief will be denied.

**H.   <u>Petitioner's Jury Instruction Claim (Ground 7).</u>**

Petitioner argues in Ground 7 (Pet., ¶ 12 at docket entry 6, p. 32), that the jury charge for attempted aggravated assault and attempted child endangerment were biased against him because they "did not differentiate clearly between an adult role-playing with another adult as anything as being legal or that [the] State had to prove beyond a reasonable doubt to [the] trial jury that Petitioner actually believed he was talking to an actual child,

23

even though Petitioner was not, and that such communications violated [state law]."  Petitioner raised the jury charge claim to the Appellate Division, which rejected it without discussion (RA 6 at **1-2).

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief.  Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly." "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations omitted).  Thus, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law."  Smith v. Horn, 120 F.3d 400, 416 (1997), cert. denied, 522 U.S. 1109 (1998).  See also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every

24

fact necessary to constitute the crime with which he is charged"); <u>Sandstrom v. Montana</u>, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

The record reveals that here, Petitioner's jury was charged with the reasonable doubt standard.  (RA 13).  The trial judge charged:

> The burden of proving each element of the charge beyond a reasonable doubt rests upon the State, and that burden never shifts to the defendant. The defendant in a criminal case has no obligation or duty to prove his innocence or offer any proof relating to his innocence. The prosecution must prove his case by more than a mere preponderance of the evidence, yet not necessarily to an absolute certainty.
>
> The State has a burden of proving the defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases where you were told that's necessary to prove only that a fact is more likely true than not true. In criminal cases the State's burden must be more powerful than that, it must be beyond a reasonable doubt. A reasonable doubt is an honest and reasonable uncertainty in your minds about the guilt of the defendant after you have given full and impartial consideration to all of the evidence.

(RA, 5-20-04 Trial Transcript, p. 202).  It is clear from a review of the charge, that the charge did not lift the burden of proof.

As noted, there was substantial evidence to convict Petitioner of the crimes charged.  That the jury chose to find him guilty based on the State's case against him, instead of not

guilty based on his testimony, does not reveal that the trial was unfair, or that Petitioner's constitutional rights were violated. This ground for habeas relief must be denied.

## I.   **Petitioner's Appellate Division Claims (Grounds 8-10).**

In Grounds 8 through 10 of his petition, (Pet., ¶ 12, docket entry 6 at pp. 33 through 36), Petitioner complains about the Appellate Division panel that reviewed his conviction, arguing that the panel agreed with Petitioner yet upheld his conviction (Grounds 8 and 9), and that the panel stated that Petitioner was convicted by speculation (Ground 10).

This Court finds that Petitioner's arguments have no merit, as evidenced by the Appellate Division decision (RA 6), and finds no reason to upset the findings of the state courts.  As Respondents point out in the answer, the Appellate Division did not accept Petitioner's position, and the jury rejected Petitioner's role-playing defense.  Furthermore, as noted by Respondents, the Appellate Division did not hold that Petitioner was convicted on speculation, but rather discussed speculation in terms of remanding and merging the sentences.  (Answer, ¶ 12).

These claims do not warrant habeas relief.

## CERTIFICATE OF APPEALABILITY

The Court denies a certificate of appealability because Petitioner has not made "a substantial showing of the denial of a

constitutional right" under 28 U.S.C. § 2253(c)(2).  <u>See</u>
<u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003).

<u>**CONCLUSION**</u>

Based on the foregoing, Petitioner's petition for a writ of
habeas corpus is denied.  An appropriate Order accompanies this
Opinion.


                                        s/ Noel L. Hillman
                                   NOEL L. HILLMAN
                                   United States District Judge


Dated: February 6, 2012

At Camden, New Jersey